```
                                       UNITED STATES DISTRICT COURT
                                       SOUTHERN DISTRICT OF FLORIDA

                                       CASE NO. 06-14269-CIV-MARTINEZ
                                       MAGISTRATE JUDGE P.A. WHITE
TERRY GLISPY,                :

        Plaintiff,           :

v.                           :         REPORT OF
                                       MAGISTRATE JUDGE
ROY RAYMOND, et al.,         :

        Defendants.          :
_____
```

## I.  INTRODUCTION

The plaintiff, Terry Glispy, filed an amended pro se civil rights complaint pursuant to 42 U.S.C. §1983 (DE# 11), raising a claim of endangerment based on events which occurred on February 12, 2004, at the Indian River County Jail ("IRCJ"), where Glispy was then confined. After prior Reports (DE#s 11, 78), and Orders thereon (DE#s 20, 81), the case remains pending on claims against six defendants in their individual capacities, who are identified in the operative complaint as: Roy H. Raymond, Sheriff of Indian River County; Lt. Shelby Strickland; Sgt. Leonie Pratt; and Deputies Walter Gregg, Troy Stallings, and Scott Prouty.

Glispy's claim of endangerment, or failure to protect him from risk of harm, stems from a physical attack upon him by another inmate [Craig Bell] at the IRCJ recreation yard. Glispy alleges that he sustained injuries, and that upon filing his amended complaint two years after the incident he remained in chronic pain.[1] The incident allegedly occurred when more than 100 inmates were released into the yard. All of the high risk inmates, wearing red jump

---

[1]  Glispy alleges that from the blows inflicted upon him by Bell, and his efforts to ward them off, he sustained injuries to his head, spine, hands, arms, and ankles. He alleges that he was given an ice pack immediately after the fight. Two weeks later his ankles and hands were still swollen; x-rays were taken thereafter; and in the first week of March he was taken to the Orthopedic Center of Vero Beach, where Dr. Steinfeld determined that he did not need surgery, but that physical therapy was required. Glispy was referred to Dr. Roslyn B. Evans at Indian River Hand and Upper Extremity Rehabilitation, and therapy was conducted from late March into April of 2004. Glispy's further complaints to jail medical staff resulted in more x-rays being taken by Dr. Charles, of his AC joint, shoulder joint, and lumbar spine. These showed no fractures or dislocations, but revealed degenerative changes.

suits, were required to wear leg shackles. Inmates in lower risk classifications, wearing green or blue jumpsuits, were unrestrained. Glispy, who was a red-suited inmate, claims that his leg shackles impeded his ability to protect himself from his inmate attacker. He also alleges that officers did not intervene to stop the attack.

At the core of the complaint is Glispy's allegation that the Indian River County Sheriff's Office ("IRCSO") had a "de facto policy, practice, and procedure" requiring that "Red" classified inmates must "always be segregated from other inmates unless directly supervised by an officer, because they are always shackled and have their movement severely restricted." Glispy contends that the policy was ignored on an ongoing basis, and that "Red" inmates were routinely commingled together with inmates of different risk levels, on the recreation yard, without proper supervision.

**This Cause is before the Court upon motions for summary judgment filed for each of the six defendants: Prouty (DE# 82), Stallings (DE# 83), Gregg (DE# 84), Pratt (DE# 85), Strickland (DE# 86), and Raymond (DE# 87),** as to which plaintiff Glispy was advised of his right to respond.[2]

---

[2] Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  (citations omitted)

## II. <u>DISCUSSION</u>

The six defendants' motions are almost virtually identical. As supporting exhibits, they each offer two exhibits which are the same: <u>Ex.A</u>, Glispy's 2/20/08 Deposition; and <u>Ex.B</u>. an incomplete copy of IRCSO Intra-Divisional Procedure 900.901.4.00 [captioned Inmate Classification].[3] Three defendants, Pratt, Strickland and

---

Thus, in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to <u>Celotex</u> and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. <u>Hoffman v. Allied Corp.</u>, 912 F.2d 1379, 1382 (11 Cir. 1990). If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11 Cir.), <u>cert.</u> <u>denied</u>, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. <u>Earley v. Champion International Corp.</u>, 907 F.2d 1077, 1080 (11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial <u>Fed.R.Civ.P.</u> 56(e); <u>Coleman v. Smith</u>, 828 F.2d 714, 717 (11 Cir. 1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986); <u>Baldwin County, Alabama v. Purcell Corp.</u>, 971 F.2d 1558 (11 Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, <u>supra</u>).

Pursuant to <u>Brown v. Shinbaum</u>, 828 F.2d 707 (11 Cir.1987), an Order of Instructions (DE# 88) was entered, informing plaintiff Glispy as a *pro se* litigant, of his right to respond to the defendants' motions for summary judgment. The Order (DE# 88) specifically instructed Glispy regarding the requirements under <u>Fed.R.Civ.P.</u> 56 for a proper response to such motions.

[3] The filed copies of the IRSCO procedure 900.901.4.00 include only 7 of the 8 pages that comprise the Inmate Classification procedure. At the bottom of page 7 appears Section "IV.C.," captioned "Risk levels jumpsuit color designations." Page 7 ends with Section "IV.C.1." which pertains to "Red

3

Raymond, also offer a third exhibit: <u>Ex.C</u>, a copy of IRCSO Intra-Divisional Procedure 900.902.9.06 [captioned Inmate Recreation].

Each defendant argues that he is entitled to summary judgment because he was not deliberately indifferent to a known risk of bodily harm to the inmate/plaintiff; and argues that he is entitled to qualified immunity. The defendants argue that plaintiff Glispy, at deposition, acknowledged that he had been confined at the IRCJ for 6 months prior to the attack; that as a shackled high risk inmate he had gone to the recreation yard twice a week, commingled with other inmates; that he could not recall a single instance in which a lower risk inmate had attacked a high risk inmate; and that prior to the day in question he had no cause to fear for his safety at the hands of any particular inmate, including inmate Craig Bell.

Each of the defendants argues in his respective motion [Prouty, Stallings and Gregg at p.9; and Pratt, Strickland and Raymond at p.10] that "According to the Plaintiff's Amended Complaint, [he, the defendant] was on-duty and operating the electronic doors." This single sentence in each motion is the sole reference by each defendant to the nature of his role as an IRCSO officer, and to what the plaintiff purportedly alleged that he [the defendant] did or failed to do, so as to place him [the inmate/plaintiff] at risk of harm from other inmates.

In fact, only two defendants, Gregg and Stallings, are claimed to have operated the electronic doors to pods in D-hub, allowing inmates of the various classifications to mix. Prouty is alleged, in part, to have opened doors to the recreation area.

The alleged factual bases for plaintiff Glispy's complaint against each of the six defendants (at DE#11, pp. 8-9) are, as follow. <u>Sheriff Roy Raymond</u> was aware that the policy to not commingle inmates of differing security levels was being violated

---

-- High Risk." It is uncertain whether the missing page, page 8 of 8, pertains to other jumpsuit colors, such as Green or Blue, which are referenced by plaintiff in his pleading, and if so, what it states.

on a regular basis, and yet did nothing to see that the policy was enforced, in disregard of the safety of inmates under his control. <u>Lt. Strickland</u>, the Officer In Charge of the shift during which Glispy was attacked, knew of the policy to not commingle different classifications of inmates, but did nothing to enforce it. <u>Sgt. Pratt</u>, the officer "directly responsible for the safety and care of all the inmates on the shift," allegedly "knew how the inmates would be commingled" and "knew that it was happening in the manner described...", yet he failed to correct the problem. <u>Deputies Gregg and Stallings</u> were "in electronic control of the opening and closing of the doors to the pods in D-Hub," and by "opening the doors to all of the Pods simultaneously and commingling all classifications of inmates where such was against jail policy," they acted contrary to jail policy, thereby allegedly placing the plaintiff and other inmates at risk of harm. Finally, <u>Deputy Prouty</u>, a recreation officer, is alleged to have opened the recreation yard to "Red," "Green," and "Blue" classification inmates, and to have been posted in the enclosed security tower overlooking the yard while the altercation between inmates Bell and Glispy continued for 10-15 minutes. Plaintiff Glispy also alleges that although there were approximately 127 inmates in the recreation field area, no officers were on the yard to provide security. He further alleges that no officers came to intervene, that the fight had to be broken up by other inmates, and that only thereafter did officers arrive and place him and Bell in confinement.

In his Response opposing the defendants' motions, plaintiff Glispy argues that "any reasonable officer would have recognized the inherent danger in the situation being litigated." Glispy also reasons that "the defendants were deliberately indifferent to the potential harm created by commingling shackled and unshackled inmates, because just after this incident between Plaintiff and inmate Bell, the Indian River County Jail issued certain intradivisional procedures regarding inmate classification and inmate recreation." (DE# 96 at p.3). This assertion, read together with Glispy's other allegation that prior to the attack upon him the jail officials had been operating under a *de facto* policy

requiring that inmates of differing security levels not be co-mingled, is construed to mean that prior to the attack on Glispy there existed a policy requiring such separation, that despite its existence, the policy was routinely ignored, and that following the attack upon Glispy procedures were amended.

The Intradivisional Procedures which are of record in this proceeding, filed as defendants' Exhibits B and C (i.e., procedures number 900.901.400 [Inmate Classification] and 900.902.9.06 [Inmate Recreation]), indeed were promulgated and put into effect within months <u>after</u> the February 2004 incident involving the plaintiff and inmate Bell. They were issued on 6/22/04, effective 7/1/04; and subsequently were revised in July of 2007. (<u>See</u> Defendants' Exhibits B and C, respectively).

At §IV.C., captioned "Risk levels jumpsuit color designations," the June 2004 Classification procedure states that "Red - High Risk - inmates" are inmates "having greatest potential to violate security and control procedures, or become a danger to themselves or others." It further states that as a class they "require the highest level of control and supervision offered by the facility." (Defendants' Ex.B, p.7). The procedure states that Red/high risk inmates are to remain in their cells up to a maximum of 23 hours per day, but will be allowed out of their cell for one scheduled hour each day, and receive additional out of cell time to participate in outdoor recreation, etc. (<u>Id.</u>). The procedure further provides that for Maximum Custody/High Risk inmates, "[e]scorts of this custody level will require two (2) Sworn Correctional Deputies at all times, and include the use of mechanical restraints at all times when the inmate is out of their assigned cell." (Ex. B, Definitions, Procedure at §II.15).

The June 2004 Recreation procedure provides that inmates are to have the opportunity for 3 hours of exercise per week, (Ex.C, §II.A.), that when security is not compromised, recreation will be provided twice per week (<u>Id.</u>, §II.B.4.), and that "staffing shall be sufficient to allow for either group or individual activities."

(Id., §II.B.6.). It provides that each deputy assigned to tower duty is to be armed and trained in use of the firearms (Id., §II.C.), and is to assist the other tower deputy in observation of recreation yards (Id., §II.C.4.). The procedure also provides that deputies assigned to recreation security may use the integrated outdoor audio system (through he telephone system in each tower), or may use a bullhorn to give inmates on the yard instructions or commands (Id., §II.C.1.); and that each deputy is to have a two-way radio (§II.C.2.), and keep control of his/her respective recreation yard, (§II.C.3.). The inmates are to be properly dressed while on the recreation yard (Id., §II.E.2.), and shall have the opportunity to remain in their housing units/cells if they do not desire to participate in outdoor exercise (Id., §II.E.4.). Further, the Watch Commanders, through the Corrections deputies assigned to the housing unit buildings are to ensure that: inmates listed on the "keep separate" list are not permitted on the outside recreation yard simultaneously (Id., §II.G.1.), that due caution is exercised regarding the total number of inmates permitted on the recreation yard simultaneously, so as not to jeopardize institutional security, safety of staff, the public or inmates (Id., §II.G.2.), and that inmates permitted on the yard are of like classification levels. (Id., §II.G.3.).

The defendants proffer no copies of any earlier written policies [pre-June 2004] concerning Classification and/or Recreation which might have been in effect at the time of the February 2004 incident involving inmates Glispy and Bell. Nor does the plaintiff. If before June 2004, written procedures existed, there is no documentation showing how the June 2004 procedures represented a change. There also are no memos or other documents of record to support plaintiff Glispy's assertion that the June 2004 procedures came as a result of the 2/12/04 Bell/Glispy incident.

In his Response opposing defendants' summary judgment motions (at DE# 96, p.5), the plaintiff incorporates, by reference, several un-scanned exhibits which he attached to his Amended Complaint (see

DE#11, Exs. A-E).[4] In addition to medical records (Ex.A),[5] Glispy's exhibits include affidavits of former IRCJ inmates, Toranto V. Thomas (Ex.C, dated 8/31/06), Arthur Lewis Sims (Ex.D, dated 11/6/06), and Richard E. Brown (Ex.E, dated 10/25/06).[6] Plaintiff in his Response refers to witnesses Phillip Kessler and Kasheem Ibraham (DE# 96, p.5), but he has proffered no affidavits or sworn statements from them.

Inmate Thomas states that he was present on the day of the altercation when Glispy was attacked, that high and low security inmates had been mixed by staff, that the inmate who attacked Glispy

---

[4] A copy of the un-scanned exhibits had been provided to Chambers with the Judge's copy of the amended complaint DE#11. In conjunction with preparation of this Report, the exhibits were forwarded to the Clerk for docketing and scanning, so that they will appear in the record.

[5] The medical records include documents reflecting that Glispy was evaluated and treated for medical complaints which included contusion/soft tissue damage on the right hand, including inflammation of extensor hand tendons and possible strain/sprain of finger ligaments [but no bone breakage or dislocation]; a right ankle sprain; and complaints of back, shoulder, and neck discomfort. The medical records include findings that his April 2004 neck (cervical spine) x-rays were negative, showing no gross fractures, dislocations or destructive lesions. His April 2004 back (lumbar spine) x-rays showed mild degenerative changes but no fractures or dislocations. His April 2004 shoulder x-rays showed mild degenerative changes of the AC and shoulder joint, with no acute fractures, dislocations or destructive lesions. Despite the injuries, the medical records from 4/13/04 and 10/20/04 include notations suggesting that the plaintiff was able to play basketball on the Rec yard without difficulty.  At deposition (Defendants' Ex.A) Glispy stated that, in defense, he struck his attacker [inmate Bell].  This might possibly explain the injury to Glispy's hand. The precise cause of his other injuries is unclear; but Glispy apparently attributes them to the attack, his having been knocked to the ground, and his efforts to defend himself.

[6] Plaintiff Glispy's Exhibit B consists of copies of Court documents, including a Report of Magistrate Judge entered by the undersigned, from a §1983 case brought by the affiant Sims [05-14046-Civ-Martinez, Sims v. Tracey, et al.,]. As noted in that Report, Sims alleged in his case that on August 5, 2004, at the IRCJ, guards used excessive force against him while separating him and another inmate who had instigated a fight. The case was treated by the Court as alleging use of excessive force against Sims by Officer Tracey, and the Report noted, at footnote 1, that Sims did not appear to be raising a claim of endangerment, and that, in any event, he had failed to raise a sufficient endangerment claim because he had not identified individuals responsible for separating inmates. It further noted that Sims, in response to Tracey's summary judgment motion, surmised that corrections officials attempted to coverup the incident and protect officers who had made a mistake by mixing felons and non-felons on the recreation yard.

did so while Glispy was shackled and unable to defend himself, and that although Glispy did strike blows against his attacker, he did so in self-defense. (Ex. C). Thomas also states that he can "attest to the fact that the jail regularly violates procedures by allowing shackled inmates to commingle with unshackled inmates," but Thomas does not state when a procedure came into effect requiring shackled and unshackled inmates to be kept apart. (Id.).

Inmate Sims does not state that he was present at IRCJ on February 12, 2004, or on the yard when the incident between Bell and Glispy occurred. Sims opines that an incident between him and another inmate would not have occurred if they had been kept separate (Affidavit, Ex.D; see also footnote 6 of this Report, supra). Sims also states that "this county jail doesn't follow security procedures when it come to properly separation of Low-Medium-High Risk Inmate's [sic] being let out at the same time, into the same area...". He further states "I know that specific Procedures exist at the jail to present [sic] such a mix of prisoners but is rarely, if ever followed." Sims, like Thomas, does not state specifically to what procedure he refers, or when it was promulgated.

Inmate Brown states that he has been confined at the IRCJ many times, but does not state that he was present at the IRCJ or on the facility's recreation yard on the day that Bell and Glispy fought. Brown simply states that "Security never checks the custody of the inmates. They're all release [sic] at the same time to rome [sic] among each other at Rec." (Ex.E).

### III. Analysis

Prison administrators are charged with a duty, under the Eighth Amendment, of taking reasonable measures to guarantee the safety of inmates, including to protect prisoners from violence at the hands of other prisoners. Farmer v. Brennan, 511 U.S. 825, 832-33, 114 S.Ct. 1970, 1976 (1994). In this case, it appears that the plaintiff was a pretrial detainee at the time of the events alleged, and that his claim, which would have arisen under the Eighth Amendment had he been a convicted prisoner, instead arises under

the Fourteenth Amendment. For all intents and purposes, however, the standard remains the same, and cases that would apply to convicted prisoners' claims also apply to those brought by a pretrial detainee.[7] In order to establish a "failure to protect" violation, the inmate must show that the defendant officer "acted or failed to act despite his knowledge of a substantial risk of serious harm," Farmer, supra, 511 U.S. at 842; 114 S.Ct. at 1981. A prison official may not escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complaintant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. Farmer, 511 U.S. at 843; 114 S.Ct. at 1982. The question is, whether the prison official, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health," Id., quoting Helling v. McKinney, 509 U.S. 25, 31 (1993); and it does not matter whether the risk comes from a single source or from multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Farmer, supra, 511 U.S. at 843; 114 S.Ct. at 1982. A prisoner's failure to give advance notice to prison officials of potential danger to [his] safety, alone, is not dispositive of the issue of the official's awareness, Farmer, supra, 511 U.S. at 848; 114 S.Ct. at 1984 (noting that the district court, below, may have placed decisive weight on petitioner's failure to notify respondents of a risk of harm; but further noting that the failure to give notice is not necessarily dispositive, because the petitioner [prisoner] may

---

[7] Claims concerning conditions to which pretrial detainees are subjected are governed by the Due Process Clause of the Fourteenth Amendment, Bell v. Wolfish, 441 U.S. 520, 535 (1979). See Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11 Cir. 1985)(for analytical purposes, there is no meaningful difference between the analysis required by the Fourteenth Amendment and that required by the Eighth Amendment); Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11 Cir. 1996)("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners.... However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees.")

establish respondents' [defendant prison officials'] awareness by reliance on any relevant evidence). The Court further stated that advance notice by a prisoner of a substantial risk of assault posed by a particular fellow inmate is not a prerequisite for establishing an Eighth Amendment violation, Farmer, supra, 511 U.S. at 849 n.10; 114 S.Ct. at 1985 n.10.

As the Supreme Court noted in Farmer, prison officials who actually knew of a substantial risk to inmate health or safety may be found free of liability if they responded reasonably to the risk, even if the harm ultimately was not averted, where a prison official's duty under the Eighth Amendment is to ensure reasonable safety. Farmer, 511 U.S. at 844; 114 S.Ct. at 1982-83. The Court further noted that "[w]hether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause." Farmer, 511 U.S. at 545; 114 S.Ct. At 1983.

The Eleventh Circuit, post-Farmer, has held that "[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the [Fourteenth] Amendment." Cottone v. Jenne, 326 F.3d 1352, 1358 (11 Cir. 2003) (quoting Marsh v. Butler County, 268 F.3d 1014, 1028 (11 Cir. 2001). It has also held that, to prove such a violation, the inmate/plaintiff must show (1) that there existed an objectively substantial risk of serious harm; (2) that the defendant was subjectively aware of the risk; and (3) that the defendant nonetheless responded to that risk in an objectively unreasonable way. See Cottone, supra, 326 F.3d at 1358 (citing Farmer, supra, 511 U.S. at 834, 844-45, 114 S.Ct.1970, 1977, 1982-83). The Court has further held that the constitutional violation (i.e., the official's disregard of the risk) must be shown to have caused the plaintiff's injury. Cottone, supra, at 1358 (citing Marsh, supra, at 1028). Finally, with regard to a defendant's subjective awareness of a serious risk of harm, he/she "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114

11

S.Ct. at 1979; Cottrell, supra, 85 F.3d at 1491.

In this case, the defendants argue that there has not been a showing of deliberate indifference, and that they are entitled to summary judgment. They argue that this is so because plaintiff Glispy has admitted at deposition that he did not know that inmate Bell, as an individual, posed a specific risk of harm to him; that he [Glispy] had gone to recreation dozens of times over a 6 month period when Red, Blue and Green inmates were mixed on the yard, and never saw a lower-risk/unrestrained Blue or Green inmate attack a shackled Red-suited inmate; and finally, that if Glispy perceived a risk of harm to himself, he never complained administratively, so as to put jail staff on notice of that risk. All six defendants have asserted the defense of qualified immunity.[8]

As noted, supra, the Supreme Court in Farmer has stated that a risk of harm to the inmate/plaintiff need not come from a single source, and need not come from a source specific or personal to him [such as inmate Bell], and that failure of the inmate who was attacked to have put the jail/officers on prior notice that a specific risk of harm existed, is not necessarily dispositive.

---

[8] Qualified immunity, under appropriate circumstances, serves to insulate governmental officials from personal liability for actions taken pursuant to their discretionary authority. Harlow v. Fitzgerald, 457 U.S. 800 (1982). The defense "offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11Cir. 2002) (quoting Harlow, supra, 457 U.S. at 818). An official claiming qualified immunity must first establish that he was acting within his discretionary authority. Cottone, supra, 326 F.3d at 1357-58. If the official has made that showing, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate. Id., at 1358. In making such a determination, the Court engages in a two-part inquiry, first determining a threshold question, whether the facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right, Vinyard, supra at 1346; Saucier v. Katz, 533 U.S. 194, 201 (2001); and second, if under plaintiff's version of the facts a constitutional violation could be made out, then the next step "is to ask whether the right was clearly established." Vinyard, supra at 1346; Saucier, supra, at 201. If at the first stage of the inquiry, no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. Id.

Although the defendants have not themselves provided any evidence regarding their respective job duties, in general, or what they each were doing at the time of the alleged events involving plaintiff Glispy, which took place at the IRCJ on 2/12/2004, the plaintiff has stated what was each defendant's alleged job, and why he is alleged to be liable, and has alleged for each defendant, except for the Sheriff, what his involvement was on the day in question. The defendants have asserted, and the plaintiff has not disputed, that they each were acting within the scope of their discretionary authority. That being so, the burden then shifts to the plaintiff to show that qualified immunity is inappropriate.

The defendants do not argue facts or produce evidence indicating that there did not exist on 2/12/04 a policy proscribing the commingling of shackled and unshackled inmates on the IRCJ recreation yard. They simply argue that plaintiff admits that he himself had no reason to fear his attacker, inmate Bell, and that the plaintiff, having admitted at deposition that he never saw a restrained inmate being attacked by an inmate not in restraints, cannot point to evidence that he was at a risk of harm.

At this juncture in this case, in the absence of evidence from the defendants to explain otherwise, and construing the evidence in the light most favorable to the non-movant [plaintiff Glispy], the Court, having accepted as true that a "no commingling" policy existed, must also take as true Glispy's assertion that at least one reason for the asserted pre-February 2004 policy is, as follows. According to Glispy, a reason for the policy allegedly forbidding co-mingling of shackled Red-suited inmates with unrestrained Blue or Green-suited inmates, is that if an incident occurred in which an unrestrained inmate was the aggressor, the shackled inmate would [as in Glispy's case] not be able to retreat, and could be otherwise restricted in his ability to defend himself, especially if he was knocked to the ground while in leg shackles -

13

[as in Glispy's case].[9]

It is alleged that each defendant was aware of the "no commingling" policy, and yet looked the other way when it was routinely ignored during the months prior to the attack upon the plaintiff, and, except for the Sheriff [who is not alleged to have had personal involvement on the day in question], also looked the other way on February 12, 2004, when an incident occurred which resulted in injury to plaintiff Glispy.

For purposes of this Report, it appears that there was an objectively substantial risk of serious harm to restrained inmates in general if they were commingled with inmates who were unrestrained, and that the plaintiff's unrefuted allegations therefore suffice to satisfy the first requirement in the analysis.

For the plaintiff in this case, however, making a showing on the subjective awareness prong as to each of the named defendants, is much more problematic. Focusing the discussion on the claim that it was the commingling together of the various classifications of inmates (Red, Blue and Green) which made possible the attack by inmate Bell and resulted in Glispy's injuries, it does not appear that the right asserted was clearly established in 2004 at the time of the incident alleged. Computer assisted research has not revealed the existence of case law binding on this circuit, with holdings which would have put defendant officers similarly situated to those at the IRCJ on notice that restrained inmates of a higher security classification had a right not to be commingled with unrestrained inmates of lower security classifications in jail situations such as recreation.

---

[9] It is recognized that a countervailing argument could be articulated that Red-suited inmates, because they themselves are classified as high risk individuals, are shackled as a measure to preserve institutional security and order, and protect inmates, corrections officers, and the public, and that any policy requiring that they not be commingled with inmates of lower risk classifications is because the Red-suited inmates, despite being shackled, could pose a risk of harm to the Blue or Green-suited inmates assigned to lower risk classifications.

The plaintiff Glispy, apart from his own assertion that policy existed and was ignored, has offered no evidence whatsoever which would establish that the individual defendants named in this case actually drew an inference that he was at a serious risk of harm if low security unrestrained Blue or Green inmates were let onto the yard at the same time as him. It is not enough that facts may have existed from which such an inference might possibly be drawn.  If the defendant, aware of such facts, did not actually draw the inference that Glispy was at serious risk of harm, then the subjective awareness requirement necessary to prove deliberate indifference is not satisfied.  Under the circumstances, based on the claim stemming from intentional commingling, it is apparent that the defendants are entitled to qualified immunity.

With respect to three of the defendants who are alleged to have had been personally responsible for Glispy's care and safety on 2/12/04 once he was on recreation yard, however, it does not appear that the complaint, as amended, can be subject to summary disposition. These are Lt. Strickland who was Officer in Charge of the Shift; Sgt. Leonie Pratt who was "directly in charge of, and responsible for the safety and care of all the inmates on the shift;" and Deputy Prouty, the recreation officer who was stationed in the security tower overlooking the recreation yard.

Glispy alleges that he was commingled with 126 other inmates in the recreation area, without any security officers being present to supervise and provide, care, custody, and protection. Glispy also alleges that no officers were available to intervene, and stop the attack upon him, after inmate Bell, who was not restrained, approached him, instigated a verbal exchange, threw the first punch, and continued his attack upon him once he had fallen to the ground, even after some inmates had initially tried to separate Bell from him. Glispy further alleges that finally, after the attack by Bell had been ongoing for 10 to 15 minutes, it was inmates who ultimately had to intervene to stop the attack. Only thereafter, did officers arrive on the scene to further restrain Bell, and direct the two inmates, Glispy and Bell, to confinement.

Taking the un-refuted allegations as true, and construing them in the light most favorable to the plaintiff, they state that Glispy, while in restraints, was placed in a confined recreation area with 126 unsupervised inmates, that the officer in the security tower did nothing to stop an attack upon him which continued for between one sixth and one quarter of an hour; and that no security officers were available to respond and intervene to stop the attack. These alleged and un-refuted statements of fact are sufficient for judgment in favor of Strickland, Pratt, and Prouty, to be denied, where the constitution [Eighth Amendment] prohibits prison guards from allowing prisoners to suffer harm through deliberate indifference, Farmer, supra, 511 U.S. at 832; where it requires prison officials to take "reasonable measures to guarantee the safety of the inmates," Hudson v. Palmer, 868 U.S. 517, 526-27 (1984); and specifically provides that prison officials "have a duty...to protect prisoners from violence at the hands of other prisoners." Farmer, supra, at 832.

## IV.   CONCLUSION

It is therefore recommended that: 1) the motions for summary judgment by the defendants Stallings (DE# 83), Gregg (DE# 84), and Raymond (DE# 87) be GRANTED; and 2) the motions for summary judgment by the defendants Prouty (DE# 82), Pratt (DE# 85), and Strickland (DE# 86) be DENIED.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated: November 18th, 2008.

_____
UNITED STATES MAGISTRATE JUDGE

```
cc:    Terry A. Glispy, Pro Se
       DC# 574217
       Liberty Correctional Institution
       11064 NW Dempsey Barron Road
       Bristol, FL 32321-9711



       Jason Lee Scarberry, Esquire
       Bruce Wallace Jolly, Esquire
       PURDY, JOLLY, GIUFFREDA & BARRANCO, P.A.
       2455 E. Sunrise Blvd., Suite 1216
       Fort Lauderdale, FL 33304
```